Filed 10/27/22  P. v. Torres CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ANGEL ANTONIO TORRES,<br><br>    Defendant and Appellant. | H049461<br>(Santa Cruz County<br> Super. Ct. No. F19685) |

In 2014, appellant Angel Antonio Torres was convicted of first degree murder.  In 2017, this court reversed Torres's murder conviction and remanded the matter to the trial court, giving the prosecutor the option to either accept a reduction of the conviction to second degree murder or pursue a retrial on the greater charge.  That same year, the prosecutor accepted the reduction of Torres's murder conviction to second degree murder, and Torres was resentenced accordingly.  In 2019, Torres petitioned for resentencing under Penal Code section 1172.6,[1] arguing that he could no longer be convicted of second degree murder under the current version of the law.  After issuing an order to show cause, the trial court denied his petition.

_____

[1] Unspecified statutory references are to the Penal Code.  Torres initially filed his petition under former section 1170.95.  Effective June 30, 2022, former section 1170.95 was renumbered to 1172.6 without substantive change.  (Stats. 2022, ch. 58, § 10.)  For clarity, we refer to the statute as section 1172.6.

On appeal, Torres argues that under the doctrine of judicial estoppel, the People were estopped from relying on the theories that he was either the actual killer or a direct aider and abettor to murder. We conclude that Torres has forfeited his claim of judicial estoppel, and, assuming no forfeiture occurred, he is unable to prevail on the merits of this claim. We affirm the trial court's denial of Torres's petition.

## I.     BACKGROUND[2]

### A.     *The Information*

On May 4, 2011, the Santa Cruz District Attorney's Office filed an information charging Torres with murder (§ 187) and street terrorism (§ 186.22, subd. (a)). As to the charge of murder, it was alleged that a principal personally and intentionally discharged a firearm causing great bodily injury and death (§ 12022.53, subds. (d) & (e)(1)) and that the murder was committed for the benefit of, at the direction of, and in association with a criminal street gang (§ 186.22, subd. (b)(1)).

### B.     *The First Jury Trial in 2013*

In 2013, Torres was tried before a jury with two codefendants, Joel Sanchez and Jose Meza. During closing argument, the prosecutor argued that Torres was guilty of murder either as a direct aider and abettor or as the actual perpetrator. The trial court instructed the jury as to both theories. The verdict form also asked the jury to determine whether Torres personally discharged a firearm.

Although the jury subsequently found Sanchez guilty of first degree murder and Meza guilty of second degree murder, it was unable to reach a verdict as to Torres, and the trial court declared a mistrial. The prosecutor subsequently elected to retry Torres.

---

[2] We derive the procedural history from our prior opinion in his direct appeal (*People v. Torres* (Jan. 17, 2017, H040966) [nonpub. opn.] (*Torres I*), of which we take judicial notice (Evid. Code, § 452, 459; see § 1172.6, subdivision (d)(3) ["[t]he court may consider the procedural history of the case recited in any prior appellate opinion"]). Our recitation of the facts is derived from the trial record in H04966.

2

**C.**     *The Evidence at the Second Jury Trial in 2014[3]*

On September 15, 2009, Richard Campos had been staying with family on Roache Road in Watsonville when he was shot and killed.  Officers discovered three spent nine-millimeter shell casings near a car where Campos's body was found.  Campos had one gunshot wound to the top of his chest and two grazing wounds.  A nine-millimeter bullet was recovered from Campos's shoulder.

The prosecution's theory of the case was that Campos was killed as a result of the gang initiation of Meza ("Psycho"), who was required to do a "jale" or "mission"—shooting or stabbing a Northerner—to complete his initiation into Poorside Watsonville, one of two Sureño subsets in Watsonville.  Joel Sanchez ("Perico"), Jose Gonzalez ("Grifo"), Torres ("Spider"), Julian Melgoza, and Christian Ramirez-Lopez were all members or former members of Poorside Watsonville.

Meza told Gonzalez that he had a couple of days to use a nine-millimeter gun that Sanchez had given him to complete his mission.  The gang had another gun, a .22-caliber revolver owned by Torres.  On the day of the murder, Meza showed Gonzalez that he had the .22-caliber revolver owned by Torres.  Meza said that he had borrowed the gun from Torres because he did not feel confident about using the nine-millimeter gun.

Meza arranged for Sanchez to come and pick them up to complete the mission.  Sanchez arrived with Torres, and Meza and Gonzalez went inside the car.  Eventually, the group came across Campos.  After Sanchez parked the car, Gonzalez heard the sound of a gun cocking coming from Torres's direction. Torres and Meza left the car but returned after noticing a bystander nearby.  Sanchez drove the car, made a U-turn, and

---

[3] On appeal, Torres does not challenge the sufficiency of the evidence supporting the trial court's decision on his petition for resentencing.  Rather, he argues solely that the prosecutor was judicially estopped from relying on previously withdrawn theories of murder during a section 1172.6 proceeding.  Thus, we provide only a brief recitation of the facts to provide context to Torres's claims.

parked again. Torres and Meza left the car and walked toward Campos. Gonzalez then heard about seven gunshots—though not all the gunshots sounded the same. Torres and Meza came running back to the car. When they got back inside the car, Torres said that he was "sure" that he had shot Campos in the head and that he had fired two shots but then his gun had jammed.

At trial, Melgoza testified that on September 15, 2009, he purchased drugs from Ramirez-Lopez at a parking lot. As they were completing the drug sale, police cars went by, and Ramirez-Lopez commented that the "jale must be done." Ramirez-Lopez specified that the "jale" was for Meza. Afterwards, Melgoza called Watsonville Police Department Officer Juan Trujillo and told him that he was aware that Campos's murder was a planned "mission" by Poorside members, and that Sanchez, Meza, and Torres were involved. Melgoza knew that the gang was holding meetings at Sanchez's house, and he agreed to go to the meeting and wear a recorder to gain information about the murder. The recording contained a conversation between Melgoza and Sanchez. In the recording, Sanchez mentioned a "jale" and said that he "threw" it with "the kid, Spider, Little Psycho, and Grifo."[4] Sanchez said that "Grifo" stayed in the car and "they went for it." He also said that "everything came out really nice," and it was done with "two homies" and "two guns."

Ramirez-Lopez, another confidential informant, testified that he was at Sanchez's house the day of Campos's murder. Sanchez, Meza, Torres, and another individual left in a car to go complete Meza's jale. After the group left, Ramirez-Lopez met with Melgoza to complete a drug sale at a parking lot, and several police cars drove by toward Roache Road. Ramirez-Lopez later told Melgoza about the jale.

---

[4] Officer Trujillo provided a translation of the recording, which was mostly in Spanish. A defense expert who also listened to the recording, however, did not hear anyone use the word "jale" during the recorded conversation.

Some time after Campos's murder, Ramirez-Lopez spoke to Torres about the murder. Torres told Ramirez-Lopez that he had "shot the guy in the face." Torres said he shot first then told Meza to shoot. He also said that he used a nine-millimeter gun. Torres sounded to Ramirez-Lopez like he was bragging.

### 1. *The Jury Instructions and the Prosecutor's Argument*

At trial, the jury was instructed on multiple theories of liability for murder in either the first or second degree: liability as a direct perpetrator (CALCRIM Nos. 520, 521); aiding and abetting (CALCRIM Nos. 400, 401); aiding and abetting based on the natural and probable consequences doctrine (CALCRIM No. 403, modified CALCRIM Nos. 520, 521); and co-conspirator liability (CALCRIM Nos. 416, 417).[5]

During closing argument, the prosecutor argued that Torres was guilty of murder based on the law as instructed, including either as a direct perpetrator or a direct aider and abettor to the murder.

### 2. *The Verdict and Sentencing*

On February 27, 2014, the jury found defendant guilty of all charges and enhancements as alleged. The verdict form did not ask the jurors to decide if Torres personally discharged a firearm, only whether a "principal" discharged a firearm. The trial court thereafter sentenced Torres to consecutive terms of 25 years to life for murder and 25 years to life for the firearms enhancement. The trial court also imposed a

---

[5] We note that in the modified CALCRIM No. 521, the instruction stated: "[i]n order to find the defendant guilty of first degree murder as an aider and abettor, it must also be proven that the defendant aided and abetted assault with a deadly weapon AND first degree murder by a perpetrator was a natural and probable consequence of the crime which the defendant was aiding and abetting, namely Assault with a Deadly Weapon." As we later discuss, Torres argues on appeal that CALCRIM No. 521 thus limited the prosecution from pursuing a direct aiding and abetting theory, as it permitted only a theory of liability based on aiding and abetting based on the natural and probable consequences doctrine.

two-year sentence for Torres's conviction for street terrorism, which it stayed under section 654, and a 10-year sentence for the gang enhancement.

## D.    *Torres's Appeal and This Court's Remand*

In his direct appeal, Torres raised multiple arguments pertaining to alleged errors in the trial court. He also argued that his conviction for first degree murder must be reversed because the jury had been instructed that he could be found guilty of the crime under the natural and probable consequences doctrine, which the California Supreme Court had since deemed improper in *People v. Chiu* (2014) 59 Cal.4th 155.

In 2017, this court rejected all of Torres's appellate arguments except for his claim of error under *Chiu*, and we reversed his conviction after determining that the jury had been permitted to improperly convict Torres of first degree murder based on the natural and probable consequences doctrine and that it was unclear from the record whether the jury based its verdict on a legally valid theory of murder. We remanded the matter and gave the prosecutor the opportunity to accept a reduction of Torres's murder conviction to second degree murder or to retry Torres.

## E.    *Petition for Resentencing*

On May 26, 2017, the prosecutor accepted the reduction of Torres's murder conviction to second degree murder, and the trial court accordingly sentenced Torres to 15 years to life for that offense.

On January 28, 2019, Torres filed a petition for resentencing under section 1172.6.[6] In his petition, Torres alleged that he had been convicted of second

---

[6] On September 30, 2018, the Governor signed Senate Bill No. 1437 into law, which amended the Penal Code to modify accomplice liability for murder and the felony murder rule. (Stats. 2018, ch. 1015.) Senate Bill No. 1437 amended the Penal Code "as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § l, subd. (f).) Pursuant to section 1172.6, a defendant convicted of either felony murder or murder based on the natural and probable consequences doctrine can

6

degree murder under the natural and probable consequences doctrine and could no longer be convicted of murder due to the changes made to section 188, which became effective January 1, 2019.

The People filed a return opposing Torres's petition for resentencing. The People requested that the trial court summarily deny Torres's petition because he could not prove that he was convicted of second degree murder under a natural and probable consequences theory. In part, the People noted that the jury had been instructed on the theory of liability that Torres was the actual killer.

The trial court appointed counsel for Torres. Torres's defense counsel filed a reply to the People's opposition, arguing that Torres had made a prima facie showing because the prosecution did not seek a jury determination that Torres was an actual shooter, as the special allegation alleged only that a principal in the crime discharged a firearm. The trial court thereafter issued an order to show cause.

On September 24, 2021, the trial court held an evidentiary hearing on Torres's petition. The trial court stated that it had personally presided over both of Torres's trials and had refreshed its recollection by reviewing the reporter's transcripts of the proceedings and that it was "persuaded as an independent factfinder that Mr. Torres is guilty of murder on the basis that he was . . . the actual killer," and "independently of that . . . [Torres] also directly aided, abetted, and encouraged [Meza] in carrying out the jale." Defense counsel noted that the trial court was "now making a finding that no jury ever made"—that Torres was the actual killer—which seemed to "run afoul . . . of the Sixth Amendment." Nonetheless, despite defense counsel's objections, the trial court found that the People had met their burden of proof beyond a reasonable doubt that

now bring a petition for resentencing if he or she could not be convicted of murder under the current version of the law. (*People v. Lewis* (2021) 11 Cal.5th 952, 957; *People v. Gentile* (2020) 10 Cal.5th 830, 843, superseded by statute on other grounds as stated in *People v. Hola* (2022) 77 Cal.App.5th 362, 370.)

7

Torres was guilty at a minimum of second degree murder under the current versions of sections 188 and 189. The trial court thereafter denied Torres's petition for resentencing.

## II. DISCUSSION

On appeal, Torres argues that the doctrine of judicial estoppel bars the People from pursuing in his section 1172.6 proceedings what he characterizes as previously discarded theories of murder. Torres asserts that at his retrial, the People "relied primarily—if not exclusively—on the natural and probable consequences doctrine." Thus, he contends that the People knowingly abandoned the theory that he was either the actual perpetrator or that he was a direct aider and abettor. We find Torres has forfeited this claim by failing to raise it in the trial court. But even assuming Torres preserved this claim, we find no merit in his contentions.

### A. *Principles of Judicial Estoppel*

" ' " 'Judicial estoppel precludes a party from gaining advantage by taking one position, and then seeking a second advantage by taking an incompatible position. [Citations.] *The doctrine's dual goals are to maintain the integrity of the judicial system and to protect parties from opponents' unfair strategies. [Citation.] Application of the doctrine is discretionary*.' " [Citation.] The doctrine applies when "(1) the same party has taken two positions; (2) the positions were taken in judicial or quasi-judicial administrative proceedings; (3) the party was successful in asserting the first position (i.e., the tribunal adopted the position or accepted it as true); (4) the two positions are totally inconsistent; and (5) the first position was not taken as a result of ignorance, fraud, or mistake." [Citations.]' " (*People v. Castillo* (2010) 49 Cal.4th 145, 155 (*Castillo*), italics omitted.) These five elements "are mostly questions of fact [citation] requiring consideration of evidence [citation]." (*Lee v. West Kern Water Dist.* (2016) 5 Cal.App.5th 606, 630 (*Lee*).)

"The determination of whether judicial estoppel can apply to the facts is a question of law reviewed de novo." (*Blix Street Records, Inc. v. Cassidy* (2010) 191 Cal.App.4th

39, 46 (*Blix Street Records*).)  However, "[e]ven if the necessary elements of judicial estoppel are found, because judicial estoppel is an equitable doctrine [citations], whether it should be applied is a matter within the discretion of the trial court."  (*Ibid.*; see also *Lee*, *supra*, 5 Cal.App.5th at p. 630.)  Thus, "[t]he exercise of discretion for an equitable determination is reviewed under an abuse of discretion standard."  (*Blix Street Records*, *supra*, at p. 47.)

**B.**     *Forfeiture*

Preliminarily, Torres forfeited his claim of judicial estoppel due to his failure to present it below.  At no point during the proceedings below did Torres argue that the doctrine of judicial estoppel applied and precluded the trial court from considering certain theories of murder.

"The forfeiture doctrine is a 'well-established procedural principle that, with certain exceptions, an appellate court will not consider claims of error that could have been—but were not—raised in the trial court. [Citation]' [Citations.]  Strong policy reasons support this rule:  'It is both unfair and inefficient to permit a claim of error on appeal that, if timely brought to the attention of the trial court, could have been easily corrected or avoided.  [Citations.]' " (*People v. Stowell* (2003) 31 Cal.4th 1107, 1114 (*Stowell*).)

Torres concedes that defense counsel did not use the term "estoppel" before the trial court, but he insists that defense counsel's arguments encapsulated the same concepts as his judicial estoppel claim on appeal.  Torres points out that defense counsel argued at the section 1172.6 hearing that during his second trial, the prosecution sought no finding that he was the actual shooter and that the jury received no instruction on direct aiding and abetting to murder.  Though his arguments below were framed as a Sixth Amendment claim—that the trial court should not be permitted to make factual findings not made by a jury—Torres claims that the trial court must have necessarily rejected the "related" estoppel argument when it rejected his Sixth Amendment claim.

9

The Sixth Amendment argument pursued by Torres below did not apprise the trial court that he intended to also argue judicial estoppel. None of the five elements of judicial estoppel described in *Castillo* are material in determining whether judicial factfinding implicates Sixth Amendment rights. (*Castillo*, *supra*, 49 Cal.4th at p. 155; cf. *Blakely v. Washington* (2004) 542 U.S. 296, 313 [Sixth Amendment requires that the "prosecutor prove to a jury all facts legally essential to the punishment"].) Nor did the trial court's rejection of Torres's Sixth Amendment claim necessarily compel rejection of a claim of judicial estoppel. A determination that the Sixth Amendment permits the trial court to make factual findings not initially found by the jury during a section 1172.6 proceeding involves an entirely different analysis than a determination that a party's position as to those facts is incompatible to one taken in a previous judicial proceeding.

Torres nonetheless asks us to exercise our discretion to consider his argument because the facts here are "undisputed and immutable," and his claim raises a pure question of law. Yet the five elements of judicial estoppel "are mostly questions of fact [citation] requiring consideration of evidence [citation]." (*Lee*, *supra*, 5 Cal.App.5th at p. 630; see *International Engine Parts, Inc. v. Feddersen & Co.* (1998) 64 Cal.App.4th 345, 354 [existence of judicial estoppel is a factual finding that will be upheld if supported by substantial evidence]; *Haley v. Dow Lewis Motors, Inc.* (1999) 72 Cal.App.4th 497, 510 [accord].) For example, the fifth element—whether " ' "the first position was not taken as a result of ignorance, fraud, or mistake" ' " (*Castillo*, *supra*, 49 Cal.4th at p. 155)—necessarily *requires* a factual finding that may not be readily discernible based solely off the trial transcripts from Torres's second trial.[7] In other

---

[7] Torres relies on the trial court's omission of a direct aiding and abetting theory to argue abandonment, but he also acknowledges that the prosecutor did argue the theory to the jury. This conflict, if anything, tends to undermine his claim of judicial estoppel by suggesting that the asserted abandonment was " ' "a result of ignorance, fraud, or

words, contrary to Torres's position, his claim of judicial estoppel does not involve a purely legal analysis.

For these same reasons, we are not persuaded by Torres's related argument that the doctrine of judicial estoppel is not subject to forfeiture principles.[8] Although we agree with Torres that the doctrine "serves to guard the integrity of the judicial system and prevent the use of unfair strategies" (*Lee*, *supra*, 5 Cal.App.5th at p. 630), its application is discretionary even where all its elements are established (*Blix Street Records*, *supra*, 191 Cal.App.4th at p. 47). Accordingly, appellate courts have held that a failure to timely raise it can forfeit its application. (*Lee*, *supra*, 5 Cal.App.5th at p. 630.) For example, in *Lee*, the Fifth Appellate District found that the trial court acted within its discretion by determining that the defendants in a civil case "forfeited a defense of judicial estoppel by failing to raise it until after the jury returned its verdict." (*Ibid.*) As the application of judicial estoppel is ultimately a discretionary decision, it seems particularly apt to apply the principles of forfeiture here, as we can only speculate as to whether the trial court would have exercised its discretion to apply the doctrine assuming that all the required elements had been met. The trial court was never asked to exercise its discretion on the matter, and, generally, "[a] party cannot argue the court erred in failing to conduct an analysis it was not asked to conduct." (*People v. Partida* (2005) 37 Cal.4th 428, 435.)

---

mistake," ' " as opposed to tactics or gamesmanship. (*Castillo*, *supra*, 49 Cal.4th at p. 155.)

[8] We note that similar doctrines, such as collateral estoppel and equitable estoppel, are forfeited if not raised in the trial court. (*People v. Thomas* (2018) 29 Cal.App.5th 1107, 1114 [failure to plead equitable estoppel waives claim on appeal]; *People v. Morales* (2003) 112 Cal.App.4th 1176, 1185 [applicability of collateral estoppel waived if not raised in the trial court].)

Accordingly, we conclude that Torres's arguments have been forfeited due to his failure to raise the doctrine of judicial estoppel in the trial court. (See *Stowell*, *supra*, 31 Cal.4th at p. 1114.)

## C. *Applicability of the Doctrine*

Moreover, even if we were to assume that no forfeiture occurred, we would conclude that Torres's claims fail on the merits as he fails to meet one of the prerequisites of judicial estoppel, that the two positions taken by the prosecutor are " ' "totally inconsistent." ' " (*Castillo*, *supra*, 49 Cal.4th at p. 155.)

Torres argues that during his second trial, the People relied primarily on the natural and probable consequences doctrine and "knowingly" abandoned the theory that Torres was either the actual killer or a direct aider and abettor to murder. Thus, he argues that the People were precluded from pursuing these "discarded" theories during his section 1172.6 proceedings. In part, Torres claims that the jury instructions that were given at Torres's second trial, including modified CALCRIM No. 521, erroneously implied that the jury could only find Torres guilty of aiding and abetting under the natural and probable consequences doctrine and not under a theory of direct aiding and abetting. [9] He therefore insists that at the very least, the prosecutor must have abandoned the theory of direct aiding and abetting.

---

[9] Although the jury was instructed with direct aiding and abetting under CALCRIM Nos. 400 and 401, the language in modified CALCRIM No. 521 stated: "[i]n order to find the defendant guilty of first degree murder as an aider and abettor, it must also be proven that the defendant aided and abetted assault with deadly weapon AND first degree murder by a perpetrator was a natural and probable consequence of the crime which the defendant was aiding and abetting, namely Assault with a Deadly Weapon." As stated, here the trial court determined that it was persuaded beyond a reasonable doubt that Torres was *either* the direct perpetrator *or* that he directly aided and abetted the murder.

12

Yet even if we were to treat the trial court's instructions to the jury as dispositive of the prosecutorial theory (though Torres himself acknowledges that the prosecutor argued the theory of direct aiding and abetting to the jury), the trial court at the section 1172.6 hearing concluded that it was persuaded beyond a reasonable doubt that Torres was the actual killer, and it is clear from the record that the prosecutor at no point discarded a theory that Torres was the actual killer. At Torres's second trial, the prosecutor argued that Torres was guilty as the direct perpetrator, and the jury was instructed on the theory of first *and* second degree murder liability as a direct perpetrator.

Next, Torres claims that the prosecutor's decision not to pursue a jury finding on whether Torres personally discharged a firearm reflects a tactical decision to forego a finding that would have established his guilt as a direct perpetrator. But the prosecutor's decision not to pursue the finding uniquely as to Torres is not at odds or inconsistent with the later argument that Torres *did* in fact personally discharge a firearm. The decision is consistent with a prosecutorial calculation that limiting itself to a single theory that Torres personally discharged a firearm would have restricted the avenues for achieving the same sentencing exposure of 25 years to life otherwise available. (§ 12022.53, subds. (d) & (e)(1).) At no point did the prosecutor contend that Torres himself did *not* personally discharge a firearm.

Finally, Torres argues that the prosecutor's decision to accept the reduction to second degree murder necessarily represented an abandonment of the theories that Torres was the actual killer or that he directly aided and abetted the murder. Yet by accepting the reduction to second degree murder, the prosecutor did not commit to a specific theory of murder. Our remand in *Torres I* was solely premised on the fact that it was unclear based solely on the record whether the jury based its decision on a legally valid theory of murder and did not preclude the prosecution from subsequently arguing or the trial court from later finding in the section 1172.6 proceeding that Torres was the direct perpetrator. (*Torres I*, at p. *20.) Nothing about the second degree murder conviction is at odds with

13

liability under current law, when the jury was instructed below on the theories valid under current law, and the prosecutor argued those theories.[10]

Accordingly, we conclude that the trial court would not have abused its discretion had it declined to apply the doctrine of judicial estoppel, as the positions taken by the prosecutor at trial and at the resentencing hearing were not "totally inconsistent" with each other. (*Castillo*, *supra*, 49 Cal.4th at p. 155.)

### III.    DISPOSITION

The order denying the petition for resentencing is affirmed.

---

[10] Given our conclusion, there is no need to address Torres's assertion that the prosecutor was on notice that the second degree murder conviction it elected to accept "might rest on legally precarious grounds."

_____

LIE, J.

WE CONCUR:

_____

GREENWOOD, P.J.

_____

GROVER, J.

*People v. Torres*
H049461